# ASAHEL GRIDLEY

## v.

# SAMUEL WATSON, Administrator.

1. ADMINISTRATOR—*of his powers respecting incumbrances upon lands sought to be sold to pay debts.* The statute gives an administrator no power to engage in litigation to remove clouds upon the title to lands belonging to the estate, and a bill filed by him for that purpose, is obnoxious to a general demurrer.

2. But where a bill, filed by an administrator for such purpose, was fully answered, and an issue made up thereon, and a cross bill filed and fully answered, and an issue made up, and tried on testimony taken, the cause was held to have been properly heard on the merits.

3. JUDGMENT LIEN—*of its duration.* Under our statute, if a judgment creditor takes out an execution within one year from the rendition of his judgment, the judgment will be a lien on his debtor's land for the period of seven years from the last day of the term of the court in which the same is rendered ; after this period, it ceases to be a lien as against *bona fide* purchasers, or subsequent incumbrancers by mortgage, judgment or otherwise.

4. So, whether an execution may be legally issued or not, after the lapse of seven years, and be levied upon the debtor's property, it cannot operate to revive the lien of the judgment, if issued after that time, so as to subject property in the hands of those third persons named in the statute.

5. SAME—*who will be considered subsequent incumbrancers, within the statute.* A judgment was obtained against a party who had previously purchased, with his own money, a lot of ground, which was conveyed to a member of his family. The grantee contracted debts after having become invested with the legal title to the lot, and afterwards died. It was *held,* that the creditors of the grantee were subsequent incumbrancers, within the meaning of the statute, and as to them, the judgment ceased to be a lien upon the lot after the lapse of seven years, even if it had been a lien before the expiration of that time.

6. VOLUNTARY CONVEYANCE—*whether fraudulent as to creditors.* Where a debtor has property more than sufficient to pay his debts, he has a right to provide a home for his wife and children, leaving property sufficient to satisfy his creditors, and if he procures a conveyance to be made to secure that end, it will not be deemed fraudulent as to creditors.

APPEAL from the Circuit Court of McLean county ; the Hon. JOHN M. SCOTT, Judge, presiding.

The opinion states the case.

Messrs. WILLIAMS & BURR, for the appellant.

Mr. W. M. HATCH, for the appellee.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This was a bill in chancery in the McLean circuit court, exhibited by Samuel Watson, administrator on the estate of Sarah Watson, deceased, against Asahel Gridley, to remove a cloud upon the title to a certain lot in the city of Bloomington, which, he alleges, is the property of his intestate, and to which the defendant claims title by reason of a judgment and execution thereon and a sale to him thereunder, recovered by him against Samuel Watson, and for which he holds a certificate of sale by the sheriff, and which is duly recorded.

In order to a proper understanding of the case, a brief statement of the facts is necessary. They are, substantially, as follows:

James O'Donald was, in the fall of 1857, the owner of lots seven and eight, and of a part of lot nine, in block twenty, in the western addition to the city of Bloomington, in McLean county. At that time, he executed a bond for a deed to these lots, to Martha Watson, the wife of complainant, for the consideration of twenty-five hundred and fifty dollars, the greater part of which was paid by the transfer of a note, given by one Nathan Low to Samuel Watson, which was secured by a mortgage on property known as the "Denman House," which Watson had sold to Low. Mrs. Watson died in February, 1859, shortly before which, she and O'Donald made another contract, by which she transferred or surrendered this bond to O'Donald, in consideration that he would convey to her, lot six, in block eighteen, being the premises in controversy, which he did, by procuring a conveyance from Asa H. Moore, who held the legal title, to Mrs. Watson, she saying

she wanted it done for the benefit of herself and daughter, Sarah. Mrs. Watson was then very sick, and a few days thereafter, died.

Sarah Watson was, at the date of her mother's death, quite young, not more than eleven years of age, and her father breaking up house-keeping, she became an inmate of the family of S. S. Hatch, by whose testimony it would appear, that he collected and received the rents of this property for Sarah. It was by him the deed to Martha Watson, from Moore, not having been recorded, was given up to Moore, he executing a deed to Sarah in lieu thereof, and this is the intestate's title to the lot in question.

Appellant, then one of the firm of Gridley & Co., on the twenty-second day of January, 1858, recovered a judgment in the McLean circuit court, against Samuel Watson and Lyman C. Blakeslee, for about fifteen hundred and sixty-seven dollars, which became a lien on the real estate of Watson, from and after the thirtieth day of that month, that being the last day of the term of that court. On the eighth of February thereafter, an execution issued on this judgment, which was returned, with this endorsement: "returned, to be re-issued." On the eleventh of June, of the same year, an alias *fi. fa.* was issued, and returned with the like endorsement. On the thirtieth of September, thereafter, a *pluries* issued, which remained in the officer's hands until April 3, 1862, on which day it was "returned by order of the plaintiff" A second *pluries* issued February 23, 1865, which was returned May 1, endorsed as made on it, one thousand one hundred and seventy-two dollars and forty-five cents, by the sale of the lot in question to appellant, and a certificate thereof executed to him and duly recorded.

Sarah Watson lived in the family of Hatch about six years after her mother's death, and died on the twenty-sixth of January, 1865. When she came to Hatch's she had this deed from Moore to her mother in her possession, which, through the instrumentality of Hatch, as before stated, was given up

to Moore, he making a deed direct to Sarah. Letters of administration on the estate of Sarah were granted to Samuel Watson, the appellee, who inventoried this lot as her property, and Hatch and other creditors, having presented their claims for allowance, amounting in the aggregate to six hundred and seventy dollars and sixty-nine cents, that of Hatch being for five hundred and eighty-nine dollars and sixty-nine cents, for the boarding and nursing of Sarah for six years, appellee, as administrator, applied for and obtained an order of court, to sell this lot to pay these debts. In pursuance of this order, he exposed the lot for sale, and it was struck off to a bidder for one thousand dollars, but he, having discovered the lot had been previously sold as Samuel Watson's property, under the Gridley judgment, declined to comply with the terms of sale.

The administrator then filed this bill, the object of which is to set aside this certificate, issued by the sheriff to appellant, so that the property, when again offered for sale, relieved from this cloud upon the title, might sell at its value.

Appellant put in his answer, denying any title in Sarah Watson, and insisting that the first purchase from O'Donald was paid for with the money and means of Samuel Watson, and the bond executed in the name of his wife for the purpose of defrauding creditors. A replication was filed to this answer, and thereupon a cross bill was filed by appellant, setting up the matters contained in his answer, and charging fraud in all the transactions through and by which the legal title was vested in Sarah Watson, and prayed that the court shall decree that the deeds to Martha Watson, the mother, and to Sarah Watson, executed by Moore, were made in trust for Samuel Watson, and be made subject to the lien of his judgment, and that the interest of Martha Watson and Sarah Watson be declared vested in complainant, the time of redemption having expired. This cross bill was answered fully, denying all allegations of fraud, or intent to defraud, and insisting that the money which paid for this property, was the money of Martha Watson; alleging that on her death bed she

requested and directed that her daughter Sarah should have this property, and that it should be conveyed to her, which her sudden death prevented her doing; insisting that appellant had no right to levy his execution upon this property, as it was at no time the property of Samuel Watson; that the judgment was no lien upon it when the execution issued under which it was sold; that both the execution and sale were void; that appellant had slept on his rights until other parties had given credit to Sarah on the faith of the title to the property being in her.

A replication was put in to this answer and the cause referred to the master, to take proofs. On the coming in of the master's report, the court dismissed the cross bill, and decreed that the levy of the execution on the twenty-third of February, 1865, on the judgment rendered on the twenty-second of January, 1858, and the sale thereunder, should be set aside, canceled, and held null and void.

It will be seen from this statement of the case, and the scope and object of the bill filed by the administrator of Sarah Watson, that it is a case directly within the decisions of this court, in the cases of *Stone* v. *Wood*, 15 Ill. 177; *Smith et al.* v. *McConnell*, 17 ib. 135; *Phelps* v. *Funkhouser*, 39 ib. 401; and *Cutter, Adm'r*, v. *Thompson et al.* 51 ib. 390.

It was held in those cases, that an administrator had no right to jeopard the interests of an estate, or waste the assets in litigation of this character, but must administer the estate as he finds it; that if it becomes necessary to convert real estate into personal assets, and to which the title may be doubtful, or a bare claim to which existed in the estate, he must sell it as such. It was, however, suggested, that to prevent a sacrifice of real estate, on the title to which a cloud may rest, susceptible of removal, the heirs interested in such estate, might, by an application to a court of chancery, file a bill to enjoin the sale until the matter could be investigated and the title adjusted.

Such being the views of this court, as expressed in those cases, the bill filed by the administrator was obnoxious to a general demurrer, but as the bill has been fully answered, and an issue made up thereon, and a cross bill filed and fully answered, and an issue made up, and tried on testimony taken, the cause was properly heard upon the merits.

The grounds for reversing the decree appear from the points made by appellant, the first of which involves the merits, and it is that in any case where an execution has issued within one year from the rendition of the judgment, an alias *fi. fa.* may issue at any time thereafter, until the statute of limitations has run against the judgment, and decisions of the courts of some of the States are cited in support of the proposition.

We do not consider it necessary to examine them particularly, having our statute to guide us, and the decisions of this court thereon. Our statute declares that a judgment shall be a lien on such lands, tenements, and real estate, from the last day of the term of the court in which the same is rendered, for the period of seven years, provided, that execution be issued at any time within one year on such judgment, and from and after the said seven years the same shall cease to be a lien on any real estate, as against *bona fide* purchasers or subsequent incumbrancers by mortgage, judgment or otherwise. R. S. Ch. 57. Language more apt, to convey the meaning and intention of the legislature, could not be employed. The provision is so plain as to stand in no need of construction. Its plain reading is, if a judgment creditor takes out an execution within one year from the rendition of the judgment, the judgment shall be a lien on his debtor's land for the period of seven years; after this period, it ceases to be a lien as against *bona fide* purchasers, or subsequent incumbrancers by mortgage, judgment or otherwise. *Riggin* v. *Mulligan*, 4 Gilm. 50.

Under this statute, the judgment of appellant ceased to be a lien on the real estate of the defendant therein, after the

lapse of seven years from the last day of the term of the court in which it was rendered, as against *bona fide* subsequent incumbrancers by mortgage, judgment or otherwise. It is only necessary, then, to inquire first, if the title to the property in question, either legal or equitable, was at any time in Samuel Watson, the judgment debtor ; and second, if it was, had subsequent *bona fide* liens or incumbrances attached to the property, after the judgment had so ceased to be a lien. From the facts above stated, it appears Samuel Watson never had the legal title to this property ; and it also appears, if he had any equitable title, while appellant was sleeping upon his rights other persons, in good faith, had acquired an interest in this property as creditors of the apparent holder of the legal title, and by the statute, they are to be preferred to a judgment creditor so situated. As against *bona fide* purchasers or subsequent incumbrancers by mortgage, judgment or otherwise, the lien has no force whatever. It would be a hard rule, indeed, which should allow a creditor who has issued an execution within a year, to slumber the next nineteen years, eleven months, twenty-nine days, and then on the last day of the twenty years' limitation, take out another writ, and by its potency, such as is here claimed for it, sweep away all the rights acquired, *bona fide*, whether by mortgage, judgment or otherwise, during that time. Such a law would be neither just nor politic.

The question here, is with incumbrances on this lot, by means other than by purchase, mortgage or judgment. How are creditors, claiming to have this property, the apparent title to which of record being in Sarah Watson, on the faith of which they extended credit to her, subjected to the payment of her debts. Admit the lots which were exchanged for this were paid for by the money and property of Samuel Watson. At that time, in the fall of 1857, appellant had no judgment against Watson. The judgment was obtained in January, 1858. Several executions were issued upon this judgment during that year, not one of which was returned *nulla bona*,

and no effort appears to have been made to enforce collection, and for aught that appears in the record, the judgment debtor had property sufficient to satisfy the judgment, for it is in proof by his testimony, uncontradicted, that the property he possessed was more than sufficient to pay all his indebtedness, and, it would seem, had coercive measures been resorted to by appellant, during the year 1858, he could have realized the amount of his judgment. If the purchase, in the first instance, in the name of Mrs. Watson, was with the fraudulent intent to hinder and delay appellant and other creditors, he had ample opportunity to test that question before other rights arose, and it was his duty so to have done.

But was the purchase with such intent? We leave out of view the allegation that the money of Mrs. Watson paid for O'Donald's bond, and assume that it was Samuel Watson's money and property which paid for it, the question arises, had he not a right, at that time, to make the purchase, in the name of his wife, and for her benefit? Certainly he had, for at that time he was solvent, possessed of property sufficient to discharge his debts. There is no allegation in the cross bill that Watson was insolvent at this time, or at any time, or that he purchased the property in the manner it was purchased and conveyed, in anticipation of insolvency. *Sweeney et al.* v. *Damron et al.* 47 Ill. 450.

We see nothing in the record to justify us in the conclusion, that Watson was insolvent in the fall of 1857, when the bond from O'Donald was made to Mrs. Watson. The uncontradicted testimony of Watson is, that he was not then in insolvent circumstances; that, although he failed in business, he had property more than sufficient to pay his debts. This being so, he had a right to provide a home for his wife and child, leaving property sufficient to satisfy his creditors. *Moritz* v. *Hoffman et al.* 35 Ill. 553. Under such circumstances, it would be unjust to hold Mrs. Watson a trustee of the title for the benefit of Samuel Watson.

13—53RD ILL.

The evidence shows the avowed purpose for which the title was taken to Mrs. Watson, in the first purchase, and why the exchange was made for the premises in controversy. For the same reasons, it would be equally unjust to hold Sarah Watson a trustee for the same purpose.

But if Mrs. Watson was such trustee, it was in the power of appellant, so early as 1858, and up to her death in 1859, to institute proceedings against her to test that question, and after her death the daughter Sarah receiving, not in a private manner, but openly, the rents and profits of the premises, through her agent, Hatch, as the rightful owner thereof, up to her death, presented to appellant an opportunity equally favorable to test the question, and the more especially, after September, 1863, at which time the deed from Moore to her was placed on record. If she was then to be regarded as the trustee, merely, holding the legal title, the property equitably belonging to Samuel Watson, appellant's judgment was then a lien upon it, and it might have been subjected to the payment of his judgment. But appellant made no effort to this end, nor did he move in the matter until about the time of the death of Sarah, who had exercised control over the property from the death of her mother, and, on the strength of her title to it, had contracted debts for necessaries and for medical attendance. It is these debts her administrator is seeking to pay, by a sale of this property. The judgment of appellant was no lien on this property, and if it had been, his long delay in asserting it, during which rights of creditors have intervened, must postpone him to these creditors.

The question, whether an execution can legally issue after the lapse of seven years, might be answered in the affirmative, for the purposes of this case, and we might admit it could be levied on any estate of the judgment debtor, but that would not affect the question before us. Did the last execution, issued after the expiration of seven years, revive the lien of the judgment, so that the fruits of it might be obtained by a levy and sale of these premises? We answer, no. The office

of an execution is not to revive an expired lien, but to carry into effect an existing lien.

We perceive no legal obstacle in the way of a sale by the administrator, to pay these debts.

The levy and sale under the execution to appellant, must be set aside, and the certificate issued thereon cancelled. This was the decree of the circuit court, and it must, for the reasons given, be affirmed.

*Decree affirmed.*